Supreme Court. Albany General Term, May, 1857. Before *W. B. Wright*, *Harris* and *Gould*, Justices.

## The People *v.* John Cummings.

Since, by the Revised Statutes, a defendant in a criminal case is allowed to make a bill of exceptions, as in civil cases, and have the exceptions examined upon a writ of error, the practice of suspending judgment, to enable the court below to take the opinion of the Supreme Court upon questions raised on the trial, ought not to be encouraged.

It is no good cause of complaint, on the part of the defendant, that no precept was issued by the district attorney to the sheriff previous to the sitting of the Oyer and Terminer. Its omission, even if it is required to be issued, is not an irregularity of which anybody can take advantage. *Per* Harris, J.

No such precept is now necessary for a regular Court of Oyer and Terminer. *Per* Gould, J.

The case of *McGuire* v. *The People* (2 *Park. Cr. R.*, 148), reviewed. *Per* Gould, J.

Where, at a stated term of a Court of Oyer and Terminer, an order was entered by direction of the court, adjourning the term until a future day, and also directing the sheriff to summon, "for the adjourned term of the court, sixty jurors (to be drawn in the usual way)," and, at the adjourned term, part of the number so drawn and summoned, and also a part of the panel which had been drawn and summoned for the regular term, appeared: and the jury which tried the cause was drawn from a box containing the names of both panels, and no objection was made to the regularity of the proceedings until after conviction, it was held, that though the proceeding was technically informal, in the direction given as to the drawing of the jurors, it furnished no good reason for setting aside the verdict or arresting judgment.

The defendant, at an adjourned session of the Albany Oyer and Terminer, held in November, 1856, was tried and convicted of murder, before Mr. Justice Gould and the associate justices. No exceptions were taken upon the trial. The defendant's counsel, upon affidavits, moved, at the same term of the court, to set aside the verdict and grant a new trial, or to arrest the judgment on the ground that no precept had been issued by the district attorney to the sheriff, commanding him to summon the grand jury which found the indictment against the defendant, or the petit jury by whom he was tried; and also for irregularity in the order

for additional jurors, and in drawing such jurors. The facts shown by the affidavits are substantially the same as those which appear in the clerk's return to the *certiorari* in the case of *McCann* v. *The People* (*supra*, *p.* 272). The Oyer and Terminer refused to set aside the verdict, but suspended sentence until the opinion of this court could be obtained upon the questions presented upon the motion.

*H. Harris*, for the people.

*L. Tremain*, for the defendant.

HARRIS, J.—Before the Revised Statutes went into operation, there was no such thing as a bill of exceptions in a criminal case. If a question arose upon the trial, in respect to which the court entertained doubt, it might suspend judgment until the advice of the Supreme Court should be obtained. Whether or not this should be done was a question entirely within the discretion of the court. When it was deemed proper thus to obtain the opinion of the Supreme Court, the questions upon which advice was sought were presented by a case agreed upon by the parties, or settled by the court. It was no uncommon thing to review the decisions of criminal courts in this mode. (*The People* v. *Vermilyea*, 6 *Cow.*, 555.)

Since, by the Revised Statutes, the defendant has been allowed to make a bill of exceptions, as in civil cases, and to have the exceptions examined upon a writ of error, the former practice has for the most part fallen into disuse, although I believe there have been instances, since the adoption of the Revised Statutes, in which the advice of the Supreme Court has been thus sought. This is probably the first instance, however, in which sentence has been suspended for the purpose of taking the opinion of the Supreme Court upon questions of mere regularity, arising not upon the trial, but upon proceedings preliminary to the trial, and

The People *v.* Cummings.

presented, not by a case, but upon affidavits read in the Court of Oyer and Terminer for the purpose of setting aside the verdict. Such a practice is not, in my judgment, to be recommended, for the reason that questions of mere regularity, in no way affecting the merits of the case, and nothing else, are presented for the consideration of this court.

But I proceed to consider the questions presented by the affidavits. The first is, that no precept was issued by the district attorney in conformity with the requirements of the statute on that subject. (2 *R. S.*, 206, §§ 37, 38.) This question has already been examined in the case of *McCann* v. *The People*, just decided. If the requirement is to be regarded as at all applicable to stated terms of the Court of Oyer and Terminer, appointed and held in the manner prescribed by the provisions of the Code on that subject, it is merely directory; whether or not the precept is issued is a matter which does not concern the defendant, or, indeed, anybody else. The most that can be said of it is, that it is a venerable ceremony which has accidentally outlived its associates, and is as harmless in the breach as it is useless in the observance. Its omission is not an irregularity of which anybody can take advantage.

The second ground of irregularity upon which the defendant relies is, in the form of the order made by the court for summoning additional jurors. The stated term of the Oyer and Terminer was held on the third Monday of September. On the twenty-third of that month the court made an order adjourning the term until the tenth day of November, and also directing the sheriff to summon, "*for the adjourned term of the court,* sixty additional jurors, to be drawn by the clerk in the usual way." This order was obeyed; sixty jurors were drawn and summoned; at the adjourned term a part of the number so drawn and summoned, and also a part of the panel which had been drawn and summoned for the regular term in September, appeared. No objection was made to the regularity of the proceedings. The names of the

jurors in both panels, and who were in attendance, were placed in the box by the clerk, and the jurors who composed the jury in this case, and in the case of *McCann*, who was tried at the same session, were drawn from both panels promiscuously.

It is undoubtedly true that the order in question was technically informal. Having determined to hold an adjourned session of the Court of Oyer and Terminer, it would have been competent for the court, pursuant to the twenty-fourth section of the Code, to direct that a panel of jurors be drawn and summoned as if such court were to be held by original appointment. But then such panel would consist of thirty-six jurors. This number might have been increased by an order of the judge, not the court, that additional jurors, not exceeding twenty-four, be drawn. (2 R. S., 417, §§ 41, 42.) Thus a judge, who is to hold a court for jury trials, may always, if he think fit, have a panel of sixty jurors drawn and summoned to attend such court.

But it is probable that the court intended to proceed under another provision of the statute, by which it was authorized to direct the sheriff to summon from the bystanders, or the county at large, so many persons, qualified to serve as jurors, as might be sufficient to form a jury. The informality consists in directing that the jurors to be summoned " be drawn by the clerk in the usual way," instead of directing that they be summoned from the county at large. It has been the uniform policy of the legislature to secure, in all cases, both grand and petit jurors possessing the requisite qualifications, and free from all suspicion of partiality or prejudice, by having them drawn by lot from the entire body of citizens liable to jury duty. For this, provision is made by statute in all practicable cases. The order in this case, though not in form authorized by the section of the statute under which it was made, is in conformity with the spirit of the law.

The People *v.* Cummings.

In the case of *The People* v. *Colt* (3 *Hill,* 432) an order was made that the sheriff summon three hundred persons from the county at large. The sheriff selected the persons so to be summoned by copying their names from the jury list in the clerk's office. This was regarded as unobjectionable. Ordinarily, where jurors are to be summoned for the purpose of completing a panel, there is not time to have the jurors drawn. The sheriff is obliged, from the necessity of the case, to summon such as he can most readily find. The necessity of resorting to this mode of selecting a jury, in any case, has uniformly been deprecated. The jurors in this case were, as the statute requires, summoned " from the county at large," and the fact that the court directed that such jurors should be selected by lot from the whole body of qualified jurors, instead of allowing the officers by whom they were summoned to select them at pleasure, is not in my judgment such an irregularity as should, after a trial upon the merits, be allowed to affect the validity of the proceedings. I regard the irregularity, if such it may be called, as similar in effect to that of allowing a juror who does not possess the requisite qualifications to sit upon the trial without objection. This often happens, and yet no one ever imagined that it could be made the ground for setting aside a verdict.

I am unable to see anything in the proceedings which should prevent the Oyer and Terminer from proceeding to pass sentence according to the verdict of the jury.

GOULD, J.—In regard to the two points raised in this case, it is no doubt well to have the true rule understood, as following it will be a very easy matter whichever way it may be settled. And, first, is it true that there really was no regular jury attending the Oyer, by reason of the district attorney's not having issued the precept spoken of? (2 *R. S.,* 271, §§ 43, 44, 3*d ed.*) It certainly has been so held in the case of *McGuire* v. *The People* (2 *Park. Cr. R.,* 148), but

that decision professes to be based chiefly, and for precedent in this state solely, on the case of *The People* v. *McKay* (18 *John.*, 212), and it seems to me it is not sustained by the latter case.

It was said in the *McGuire case*, and is said in this, that the laws, both as to this precept and as to summoning jurors for the Oyer and Terminer, were the same when the McKay suit was decided as they are by the Revised Statutes, and that they continue the same under the Code. I am inclined to think, however, that neither position is strictly correct. The Revised Laws of 1813 (1 *R. L.*, 326, § 6) provided that every *venire facias* for the trial of any issue, civil or criminal, should be awarded to the body of the county, &c.; and in section nine (*id.*, 327) it is prescribed that the writs of *venire facias juratores* shall contain a precise form of words, showing that a writ of *venire* was necessary to the summoning of any jury. And though section eleven (*id.*, 328) provides that, fourteen days prior to the sitting of any court of record, the names of the jurors for the trial of issues therein shall be drawn openly and publicly, without any *venire* previously issued, and goes on to direct the clerk to draw the names, substantially as by the Revised Statutes, and deliver a panel of such jurors to the sheriff, "whose duty it shall be to summon the persons whose names are contained in such panel, and to make return in what manner he has served such process," not that he should "return" the panel or make any return on the panel (*a*), still, section four (*id.*, 326) says the sheriff shall return all writs, juries and certificates, together with the panels, and section fifteen (*id.*, 330) says the sheriff, "to whom any writ or process shall be directed for the trial of issues in said courts, shall annex a panel of the same jurors to all the said writs or process returnable at the same court." And in the next act (1 *R.*

(*a*) By the present law the sheriff is bound to return this panel to the court, specifying on it who were summoned and how, so that now the technical return is on the panel (2 *R. S.*, 511, § 30, 3*d ed*); a total difference.

*L.*, 339, 340, § 16) it is said the sheriff shall cause to come before the Courts of Oyer and Terminer so many good and lawful men, to serve as jurors therein, as said courts or any justice thereof shall from time to time direct; and, in the same section, that the district attorney shall issue precepts, under the seal of the Supreme Court, directed to the sheriffs, commanding them to do what is by said section required of them; returning any panel not being one of the things "required of them" by said section.

It is on these statutes that Chief Justice Spencer gave the McKay decision, starting (18 *John.*, 216) with the clear rule that, at common law, a *venire* was necessary to authorize a sheriff to summon a jury, and holding (*id.*, 217) that, construing these statutes together, as neither authorized the summoning of a jury without some sealed process, the legislature did not intend to supersede the use of a *venire*, and did not call the panel ordered by the first statute "a process;" that "the process" which the sheriff was to return was the *venire*, under the seal of the Supreme Court, and that the only necessity of a *venire*, after those statutes, was to have the sheriff's return made on it, on this "process."(a) And in the statement of the case for the prisoner (*id.*, 213) and the reporter's marginal abstract, it is expressly stated that "no *venire*" had been issued; the paper purporting to be a *venire* being without the seal of the court. The attorney-general (*id.*, 213) admits that "the *venire* in this case, being without seal, was void;" and in his argument (*id.*, 214) states the then practice to be that the panel, after the jurors named in it were summoned, was, by the clerk, annexed to any *venire* which might be returned, the practice varying from the law (1 *R. L.*, 330, § 15) only in this, that the clerk did what the sheriff was bound to do; thus showing, by the language of the court and of all parties that

(a) This reason has ceased (see previous note), and *cessante ratione, cessat et ipsa lex.*

that case turned solely on the need of a *venire*, it being conceded that no *venire* was issued. It is nowhere stated in that case that the district attorney's precept was the unsealed *venire* of the case; and as a true, formal *venire* was provided for by the first statute, which is the only statute that provides for the drawing or names the panel, and as it appears from the case that a panel was drawn for the court that tried the cause, it cannot be safely asserted that the want of this precept controlled that case, or even that the precept was wanting.

So far, I have considered that case on its own citations, arguments and decision; but I would state a further point, not there called up, nor noted since in any case that I have seen. By the eleventh section (*id.*, 328) the clerk, at least fourteen days before the court, and without any *venire* previously issued, was bound to draw the jury; whereas, by the sixteenth section (*id.*, 340), the district attorney's precept was to be issued at least fifteen days before the court; so that this precept must be issued one day "previously" to the drawing; and yet no *venire* need be issued previously to the drawing. It can hardly be that the precept was the unsealed *venire* that was so fatal.

But, to compare these statutes with the present law: "It shall not be necessary, in any case, to issue or award any *venire* for the summoning of jurors to any Circuit Court, &c., except where a foreign jury is ordered." (2 *R. S.*, 507, § 9, 3*d ed.*) (See note on page 348 for a sufficient reason; a technical "return" is now to be made on the panel.) And, —bearing in mind that Cummings was tried at an Oyer held at the same time and place as the Circuit,—it is said (2 *R. S.*, 819, § 2, 3*d ed.*), in regard to issues of fact on any indictment, "such trials shall be had by jurors drawn, summoned and returned(*a*) in the manner prescribed by law; and where

(*a*) Does the prisoner need two processes, that more than one return may be made? (See prior notes.)

any Court of Oyer and Terminer shall be held at the same time with any Circuit Court, the jurors returned for such Circuit Court shall be the jurors for such Oyer and Terminer." And by the Code (§ 21) it is provided that "Circuit Courts and Courts of Oyer and Terminer shall be held at the same places and commenced on the same day;" so that it is not now necessary to issue any *venire* for a jury for any regular session of an Oyer and Terminer. And, to apply the present law to the *McKay case*, above cited, if the district attorney's precept was the *venire* there named, it is, by statute now, if not then, done away with for any regular Oyer and Terminer; if it was not that *venire*, then the case is no authority for the *McGuire case*, and the latter must rest on its own reasoning. Let us see how it stands, on that basis.

By sections forty-three and forty-four (2 *R. S.*, 271, 3*d ed.*), section forty-one having provided for holding special Oyer and Terminers, the district attorney is ordered, before the time appointed for the holding of "such or any other Court of Oyer and Terminer," to issue a precept, tested, sealed, &c., directed to the sheriff, commanding him "to summon the several persons who shall have been drawn in his county, pursuant to law, to serve as grand and petit jurors at the said court, to appear thereat." And, to show who are, pursuant to law, drawn to serve at the said court, turn to the same volume (*p.* 509, § 24): "Fourteen days before the holding of any Circuit Court, or of any special Court of Oyer and Terminer, when no circuit is appointed to be held at the same time," the clerk of the county shall draw the names, &c., of "persons to serve as jurors at such court." And (*p.* 18, § 2; *Code,* § 21), at any regular Oyer and Terminer, held at the same time as a Circuit, the jurors of the Circuit, drawn and returned for it, are to be (not are drawn as) the jurors for the Oyer and Terminer. And it must also be borne in mind that the Code (§ 23), as well as the Revised Statutes (2 *R. S.*, 271, § 41, 3*d ed.*), provides

for holding special Courts of Oyer and Terminer, which are then held without any Circuit Court. Inasmuch, then, as no "other Court of Oyer and Terminer," than the "such" special ones as are provided for in said sections forty-one and twenty-three, can possibly be held, except at the same time and place as the Circuit; and as the Circuit jury is drawn for the Circuit only (*id.*, 509, § 24; 819, § 2), but is the jury for the regular Oyer and Terminer, it follows that now, under the Code (and the *McGuire case* is under the Code), the words "or any other" (§ 43), are utterly inoperative; and no such precept is necessary for any regular Oyer and Terminer.

To avoid what might thus seem the absurdity of those words (§ 43), it is but justice to say that, by section thirty-four (2 *R. S.*, 270, 3*d ed.*), it is only provided that the regular Courts of Oyer and Terminer "may be held at the same time and place at which any Circuit Court may have been appointed to be held." So that, though the words "any other" could never have been strictly operative, to the requiring of the precept, there might, then, have been some other Courts of Oyer and Terminer, besides the special ones, for which the precept was necessary.

It is necessary to consider, next, whether the order of the Oyer and Terminer, to summon sixty additional jurors, was irregular and void. By section three (*id.*, 819), it is provided that whenever, for any reason, there shall not be the names of twenty-four jurors, then attending, in the box, the Court of Oyer and Terminer shall order the sheriff to summon, "from the bystanders, or from the county at large," so many qualified persons as shall be "necessary to make at least twenty-four jurors, from whom a jury for the trial of the indictment may be selected." There can be no controversy as to the number (sixty) ordered to be summoned, as the statute most certainly does not limit the number, except as to the minimum. For the benefit of the prisoner, to give him an opportunity of selection, so far as

the rules allow it, or the fortune of the lot, there must be a full panel of twenty-four; but the maximum is discretionary with the court.

But at the end of this order are the words, "to be drawn by the clerk, in the usual way;" and this clause is claimed to vitiate, to make absolutely void, the prior portion of the order, acknowledged to be, without this clause, good. I will not now inquire into the merits of this point; though the affidavits on behalf of the prisoner show that he wished a chance, not for fair jurors, without any bias, but for "city jurors," in the unavowed, and hardly unavowed, hope that they would be biassed in his favor. At present, I will treat it technically. Even for this purpose, it is not necessary to refer to the prisoner's citation (*p.* 515, §§ 53, 54), as that by no means changes or interferes with the section already commented on (*id.*, 819, § 3); they are substantially the same, and section forty-one (*p.* 513) has nothing to do with this case, as that was not intended to be followed (2 *Park. Cr. R.*, 53) applying only to this forty-first section is not here applicable. To proceed then:

As the jury box from which these sixty jurors were actually drawn contained the names of all persons in the county who were both liable to serve and qualified for serving as such jurors, the order as it stands is to all intents and purposes coextensive with, legally synonymous with, an order to summon, in the very words of the statute, "from the county at large," and so far there is no error. Had the sheriff, on his own motion, procured the clerk to draw for him sixty names from the box, and then summoned the persons whose names were so drawn, there could be no pretence of any irregularity. (3 *Hill*, 434, 436, *is directly in point.*) But the order to draw them, it is said, took away the sheriff's discretion as to whom he should summon, and the prisoner is entitled to the benefit of that discretion.

Now, had the court verbally so directed the sheriff, there would, it is conceded, have been no error, as it would have

been but advisory or directory, and the sheriff could have exercised his discretion in complying or refusing to comply with the direction. Is it anything more than directory now? The parts of the order are plainly separable, and on its face are separated; the words objected to being in a parenthesis, as if intended merely to assist the sheriff in an arduous duty. If this part were clearly void, the only necessary result was that the sheriff might disregard it, and comply with the part which was as clearly good. That he did comply with both parts is no more an avoidance of the good part, than, as above suggested, would have been his compliance with a verbal remark of the court, not in the order, or his drawing the names without either order or remark: compliance, this part not being valid, is a mere exercise of his discretion. Had the act done been illegal, an invalid order could not have made it legal; and the act done being legal (3 *Hill*, 434, 436), is it made illegal by an invalid order, or is the entire order made void by the doing, even nominally under it, of a perfectly legal act? If in any way under or against the order the sheriff had actually summoned them improperly, the array could be challenged; or if improper persons were summoned they could be objected to; but neither of these is alleged. The jury were but too fair, and too fairly summoned, to suit the emergencies of the case.

But I think that the further we look the stronger will be found the reasons for saying that these words had no effect on the preceding good order. I presume it will be conceded at once that if these words be, as an order, a mere nullity, binding no one, the prior parts of the order are not hurt thereby; as *utile per inutile non vitiatur*. And to prove them a mere nullity, two positions will suffice: First. The sheriff, in and of himself, had no control over the boxes of jurors' names, and no legal right to touch them; nor had the court, the Oyer, any right to order him to do so, or any power to help him to comply with such an order; Second. The clerk

of the county, and he only, having any right to open or con-
trol these boxes, or to draw from them a single name, the
court of Oyer and Terminer has no authority over them, as it
can make no order, under any circumstances, directing the
clerk of the county to draw a single name from either box.
Clerks of counties are, *ex officiis,* clerks of that court. (2
*R. S.,* 272, § 50, *3d ed.*) But that court has no control
over them, except as clerks of the court. As clerks of the
counties, they are in all their acts, as such clerks, officers
independent of all courts, unless by statute provision. The
action of county clerks in the ordinary drawings of jurors is
not by the order of any court, but is a duty imposed by
statute. ( *Id.,* 509, § 24, *3d ed.*) And though (*id.,* 513, §
41, *3d ed.*) in a specified case and manner, a circuit judge
may order additional jurors to be drawn, and so, by
implication, can order it done in the only way in which
jurors can by law be drawn, and thus may make an order
which really binds the county clerk, as such, still, by no one
else, and in no other way, and under no other circumstances,
can the county clerk be ordered to draw a jury for such
a court. The third section ( *p.* 819) gives no power to
order the clerk, even of the court, had he the power to do
any such thing; and as before stated, this section, not
section forty-one, was followed in this case. The words
" to be drawn" &c., did no good, and did no hurt. Legally,
they are not there; and the order remains good, to the
sheriff, to summon sixty additional jurors. And whatever
was actually done, purporting to be a drawing of additional
jurors, was, on the part of the sheriff as well as of the clerk, a
merely voluntary act, and not a duty imposed by any order.
The sheriff has, in fact and in law, merely taken a means to
help his discretion; and the sixty were talesmen, duly sum-
moned as such.

Still further: were the prisoner technically right as to
this order, I see no reason, even without any statute pro-
vision, and in a capital case where it is plain that no injury

can have been done, why he should not be held to strict
technicality, and be told that he has consented to the
jury, with knowledge, or the means of knowledge at the
clerk's desk, of the facts, and the time for him to be tech-
nical is past (2 *Park. Cr. R.*, 308); and as to any injuries
being done by the organization of this jury, an examination
of the case will show that what the prisoner complains of
is really that the jurors were too impartial, and that his
counsel "intended" to exhaust the regular panel, drawn
in the way the law has carefully hedged in to insure com-
petent, unbiassed jurors, "with the hope that out of the
talesmen" to be summoned by the sheriff from the mere
bystanders, in haste, and in unavoidable ignorance of their
fitness, "there would be a fair proportion of city jurors;"
but discovering so large a number of jurors in attendance
he abandoned this hope of getting partial jurors. The
affidavits of Myron, the clerk, and the district attorney show
however that this abandonment of the plan was not wise,
as there were but twenty-seven jurors in attendance, two
of whom were excused from serving for cause, leaving but
twenty-five; so that his twenty peremptory challenges
would have left but five jurors, and seven might ordinarily
be considered a fair proportion of twelve, to be summoned
hastily and unadvisedly, for the purpose of not doing justice.

It appears further, by Morange's affidavit, that notice of
the drawing of the sixty jurors was published "at least six
days before the drawing," that being the legal time, in a city
newspaper of large circulation, where and as the drawing of
the regular panels was advertised; and the prisoner's affida-
vits show that, before the jury was impanneled, his counsel
knew that this large number of additional jurors had been
drawn, though he did not know the "precise terms of the
order directing them to be drawn and summoned," while
the district attorney's affidavit shows that the counsel
inquired of several of the jurors for which court, September
or the adjourned term, they were summoned.

The People *v.* Cummings.

In all this is there any violation of legal principle, any matter of infringed rights, anything of possible prejudice or injustice to be found? any reason why, simply because the case is momentous in its issue, there should be indulged a straining after technicality to pronounce this jury improperly or illegally organized? All such cases are momentous to others than the accused. Public justice is involved in the matter. The whole people have interests to be prejudiced, and rights to be impaired, and life to be endangered, by any rule that, under cover of seeking the straightest technicality of law, subverts justice.

Beyond this there seems to me to be, to both the prisoner's points, a sufficient answer in the fullness of our statutes in regard to the class or kind of objections which shall be ineffectual at such a stage of a cause; since those statutes cover any defect or imperfection in matters of form, in either indictment or trial, which shall not tend to the prejudice of the defendant. (2 *R. S.*, 519, 520, 813, 814, 3*d ed.*) And it is especially worthy of note that the statutes in force when the McKay suit was tried, not only do not cover this ground (1 *R. L.*, 497, 13), but the statute of *jeofails* relating to civil suits, which is as broad as our present statutes last cited, contains a provision that it shall not extend to criminal cases (1 *R. L.*, 122, § 11), which sufficiently accounts for that decision. This law was "revised" in 1829.

These latter citations of the statutes were not fully made or enforced to the court in the *McGuire case,* and that they were not there considered at all is plain, as no remark whatever is made on that point. Two years later, however, the general term in this district (2 *Park. Cr. R.*, 308, 311) did hold a train of reasoning which fully sustains my position. And though the decision referred only to the manner of summoning the grand jury, the reasoning fully covers the case of the petit, and substantially holds the point I have just stated. This case also holds that even in capital

cases, a prisoner, after trial, is too late to take a technical point as to a matter of mere form prior to the actual trial. (2 *Park. Cr. R.*, 308); and this part of that decision would preclude the prisoner from taking either of the points made in this case, each being, at most, a mere irregularity, working no injustice. (7 *Wend.*, 417, 428.)

In fact, as the case shows, the prisoner had an entirely unexceptionable, impartial jury, to whom he took no exception, and he must be bound by their verdict.

The Oyer and Terminer should proceed to sentence.

SUPREME COURT.    Jefferson General Term, April, 1857.    *Hubbard, Pratt, Bacon* and *W. F. Allen,* Justices.