By the Court, Balcom, J.
The judgment against the prisoner should not be reversed for any technical error *182 that was committed on his trial, which did not affect the merits of the case to his prejudice. (Shorter v. The People, 2 Comstock, 193; People v. McCann, 16 N. Y. Reps., 61; People v. Wiley, 3 Hill, 194; People v. Cunningham, 1 Denio, 524; Leven v. Smith et al., Id., 571; Willis v. People, 5 Parker, 621; S. C., 32 N. Y. Rep.,, 715; People v. Gray, 5 Wend., 289, 4 Parker, 619; People v. Ransom, 7 Wend., 418; People v. Ferris, 1 Abb. N.S., 193.)
But if any error was committed on his trial, that materially affected the case to his prejudice, it will be the duty of this court to grant him a new trial, although there may be no doubt of his guilt upon the evidence in the case. (16 N. Y. Rep., 61.)
The prisoner’s special plea to the jurisdiction of the Chemung court of Oyer and Terminer to try him, because he was in the military service of the United States at the time he murdered Amasa Mulock, if he did that act, was properly overruled for reasons assigned by Justice Mason, in delivering the opinion of this court, when the case was at the general term, on the question of the jurisdiction of the Oyer and Terminer. •
The prisoner’s special plea in bar, of “ once in jeopardy,” was properly overruled. His plea to the former indictment was to the jurisdiction of the Oyer and Terminer, to - which plea the district attorney demurred, and the court sustained the demurrer, and ordered the prisoner to plead over to the indictment; that was the situation of the proceedings on the former indictment, when the indictment in this case was found, and a supersedeas or nolle prosequi was then entered on the former indictment. The prisoner had no trial upon the merits on the former indictment, and was never in jeopardy thereon, within the meaning of the provision in our State and national Constitutions, which protect persons from being twice put in jeopardy for the same offense. (Laws of 1847, vol. 2, p. 386, § 6; 1 R. S., *183 2d ed.,p. 18, art. 5; 2 R. S., 702, § 25; People v. Tarbox, and People v. Loomis, 30 How. Pr. Rep., 318 and 323; Commonwealth v. Gould, 12 Gray's Rep., 171.)
A nolle prosequi or supersedeas was properly entered on the first indictment, when the one in this case was presented by the grand jury. (2 R. S., 726, § 42.)
After the prisoner’s plea to this indictment, of once in jeopardy, was overruled, he was required by the court to plead over to the indictment, and on refusing so to plead, a plea of not guilty thereto was entered on the indictment by order of the court. The court was authorized by statute to enter this plea of not guilty to the indictment. (2 R. S., 730, § 70.)
I shall not consider any question, raised by the district attorney, as to the regularity of the special pleas interposed to the indictment in this case, or as to the manner in which those pleas were disposed of; for I am of the opinion neither of those pleas presented a defense to the indictment, and that each was properly overruled.
Only seven jurors in the cause were obtained from the regular panel in attendance at the court. The court then directed the sheriff to draw from the box, provided by chapter 210 of the Laws of 1861, the names of thirty-six jurors (Laws of 1861, p. 528), to which direction the -prisoner’s counsel objected: 1. That the statute does not apply to the case. 2. That it is unconstitutional and void; which objections were properly overruled, for reasons I shall presently state. The names of thirty-six jurors were then drawn, and the jurors were summoned, according to the directions contained in the act of 1861 (supra). The prisoner’s counsel then interposed a challenge to the array of such jurors, in these words, to wit: “He is entitled by the law of the land to be tried by a jury drawn from the body of the county of Chemung, and not alone from the town of Elmira; and said array of jurors have not been lawfully drawn. The act of 1861, under which the court *184 made the order for drawing said jurors, does not authorize the drawing of jurors in this way for the trial of this indictment; and if such was the intent thereof, it is unconstitutional and void; and because, since the passage of said law, ' and the return of the list of jurors now in said Elmira box, and from which said list was drawn, to wit: in April, 1864, the city of Elmira has been erected by the Legislature out of a part of the former town of Southport, and the jurors in said box do not include the jurors of that part of the city taken from the town of Southport, and do include the jurors of the town of Elmira out of the limits of the city of Elmira; and because the list s'* contains the Mames of jurors not now residing either in said city or town of Elmira, and they have been summoned and áre in attendance as a part of said panel, and this he is ready to verify.” The court rightfully overruled this challenge and sustained the district attorney’s demurrer to it.
I think it is clear that the act of 1861 applies to criminal cases. There was a Circuit Court that was held at the same time with the Oyer and Terminer, at which the prisoner was tried; and it is provided by statute that “ where any court of Oyer and Terminer shall be held at the same time with any Circuit Court, the jurors returned for such Circuit Court shall be the jurors for such Oyer and Terminer.” (2 R. S., 733, § 2.) In most cases “ the jury for the trial of any indictment shall, be drawn in the same manner as prescribed by law for the trial of issues of fact in civil cases.” (2 R. S., 734, § 5.) The clerk is directed by the Eevised Statutes to provide a box, and to deposit the names of all petit jurors therein. (2 R. S., 412, § 16.) And the act of 1861 (supra) is amendatory of the Eevised Statutes in relation to trials by jury. That act requires that the clerk, “in addition to the box by law now provided and kept for the purpose of containing the names of jurors drawn to serve at any court, shall provide another box, in which he shall deposit the names of all persons *185 who have been selected and returned as suitable persons to serve as jurors, and who reside in the city or town where courts are appointed by law to be held.” (Laws of 1861, p. 528.) The second section of that act shows it is applicable to all cases tried in any court of record, except- in the counties of New York and Kings. It was, therefore, applicable to this case.
The act of 1861 does not in any manner conflict with the provision in the Constitution of the United States, which secures the right to persons accused of crime to a trial “by an impartial jury of the State and district wherein-the crime shall have been committed.” (1 R. S., 2d ed., p. 18, art. 6.) Nor is such act repugnant to the provision in the Constitution of this State, which declares that “ the trial by jury, in all cases in which it has been heretofore used, shall remain inviolate forever.” (Laws of 1847, vol. 2, p. 385, art. 1, § 2.) It is clearly within the scope of legislation to regulate such trial. (Walter v. The People, 32 N. Y. Rep., 147.) The Legislature could, therefore, provide for summoning jurors from any place in the county, as well as from “bystanders, or from the county at large,” to supply a deficiency of jurors at any court or on any trial.
The thirty-six jurors were lawfully drawn, for aught that was shown to the court at the time the array thereof was challenged. The court had the right to presume the clerk had discharged his duty in respect to putting the names of jurors on the list for the town of Elmira in the year 1863, in the box provided under and pursuant to the act of 1861". It was for the prisoner to prove that the names in that box were taken from the list,of Elmira jurors for the year 1860, and that such names were not changed when the new list for that town was returned and filed in the year 1863.
When the jury lists in and for Chemung county were made and filed in 1863, Elmira was a town, but a portion *186 of that town was incorporated into and made the city of Elmira, with certain territory taken from the town of Southport, by an act of the Legislature in 1864. (Laws of 1864, p. 248.) But that act declares that the city of Elmira shall be regarded as a town, under the provisions of the Revised Statutes, which declare when and how jury lists shall be made, returned and filed. (Laws of 1864, p. 269, § 5.) And rfo provision was made in the city charter for the return of any new list of jurors for the city or town of Elmira to the clerk of Chemung county before the time fixed in the Revised Statutes, which time had not arrived when the trial in question was had. And according to those statutes, the persons whose names were returned as jurors for the town of Elmira in July, 1863, were competent to “ serve as such for three years, and until other lists shall be returned and filed.” (2 R. S., 333, § 17.) It was therefore proper for the court to cause the names of jurors to be drawn from the box containing the names of jurors on the list returned for the town of Elmira in the year 1863. Though I do not doubt that the names on the list of jurors returned and filed for the city of Elmira in July, 1866, are those that should now be deposited in the box provided by the clerk of Chemung county, pursuant to the act of 1861. (Supra.)
Assuming that the thirty-six jurors, whose names were drawn as above stated, were on the list of jurors for the town of Elmira, as returned in July, 1863, the fact that some of the jurors so drawn did not reside in either the city or town of Elmira, at the time of the trial, was no ground for challenging the array of such thirty-six jurors.
Having shown that such challenge was not well taken, I shall not now examine the point made by the district attorney, that the prisoner’s counsel could not challenge the array of thirty-six jurors at the time and in the manner he challenged the same. <
The challenge to the juror, Hudson, for principal cause, *187 on the ground that he was not on the jury list of 1863, and that the box of Elmira jurors, from which his name was drawn was made in 1861, and not after the new list of jurors was made and filed in 1863, was properly overruled, for the reason that that objection should have been taken when his name was drawn by the clerk from the box provided under and pursuant to the act of 1861. If that objection had then been taken, an inquiry could then have been made as to what list the names in that box were taken from. It was too late to raise that objection after several of the thirty-six jurors had been drawn as jurors for the trial, and had been examined, rejected or challenged on other grounds, &c. But Hudson was finally challenged peremptorily by the prisoner’s counsel, and rejected; and the case shows the prisoner was subsequently informed by the court his challenge of Hudson would not be counted as one of the peremptory challenges allowed him by statute. Hence, if the court erred in overruling the prisoner’s challenge to Hudson, the error was rendered harmless by what subsequently occurred; and it furnishes no good ground for granting the prisoner a new trial. (4 Denio, 9; 2 Dev. N. C. Rep., 217; 16 N. Y., 61; 7 Wend., 417; 1 Abb. N. S., 193.)
The challenge to the juror, Lindsay, was properly overruled, for the same reasons that the like challenge to Hudson was overruled. But if Lindsay should have been set aside, and was irregularly and erroneously empanneled as a juror in the case, the prisoner should be deemed to have subsequently consented to his sitting in the case, for he was informed by the court that Lindsay should stand aside and not sit in the case, if he desired it, and that what had occurred should not diminish his number of peremptory challenges in the case; and he chose to stand mute. I think he could not stand mute, when informed the court would construe his conduct to be a consent on his part to Lindsay’s sitting as a juror in the case, and afterwards *188 have a new trial, because Lindsay did sit as a juror in the case, especially as Lindsay possessed all the requisite qualifications for a juror in any criminal case in the county of Chemung. If the court had directed Lindsay to leave the jury box, and had decided he could not sit in the case after he was sworn, such direction and ruling would have been erroneous; and it is highly probable the prisoner’s counsel would have excepted to the same. I infer he would have so excepted from what previously transpired in the case. I think the swearing of Lindsay as a juror, if irregular' and erroneous, does not render the prisoner’s conviction erroneous; and that, whatever irregularity or error was committed in admitting Lindsay to a seat as a juror in the case, was cured by what was subsequently said and done by the court and district attorney, and by the conduct of the prisoner and his counsel upon the question whether Lindsay should remain on the jury, or stand aside and not sit in the case. If Lindsay had not been summoned or drawn as a juror, but the prisoner had proposed he should be one of the jury in the case, and the district attorney and court had assented to the proposition, and he had then been sworn as a juror, his admission to a seat as a juror would not have been' erroneous. I think his situation as a juror should not be regarded as making the case any different in legal effect from what 'it would have been if he had become a juror by being first proposed as such by the prisoner, and had then been accepted and sworn in the manner above stated.
John S. Jackson was drawn from said thirty-six jurors, and sworn as a juror without objection; .and he was the last of the list of thirty-six jurors whose names had been drawn from the Elmira box, provided under the act of 1861; and down to this time in the trial, the court had no information that the clerk had omitted, in 1863, to take the names out of that box and deposit therein the names on the list of jurors returned and filed for the town of *189 Elmira in that year. But the matter was investigated ■before any more jurors were drawn; and the fact was duly ascertained by the court that the clerk had omitted to change the names of jurors in the Elmira box in 1863, and before any other jurors were drawn, the clerk, by direction of the court, took the names out of such box that had been put into it from the list of 1860, and deposited therein the names of the jurors for the town of Elmira on the list returned and filed in 1863. There can be no doubt that the clerk had the right, by direction of the' court on the trial, to make the proper change of the names of the jurors in the Elmira box that the clerk should have made in 1863. (The People v. Allen, 6 Wend., 486; 7 Wend., 417; 1 Abb. N. S., 193; 3 Hill, 42.)
It is unnecessary to determine whether the prisoner should have moved for a new trial in the Oyer and Terminer for any of the above mentioned alleged errors or irregularities that occurred1 on his trial. (Willis v. The People, 32 N. Y. Rep., 715.)
The objections of the prisoner’s counsel to the drawing of the names1 of forty jurors from the Elmira box, after the names on the list for the town of Elmifa in 1863 had been deposited in such box, was untenable, for reasons already assigned; and because the prisoner was asked by the court if he had any objection to the three jurors sworn, who had been drawn from the above mentioned thirty-six, and he made no objection to either of them; and he should be deemed to have assented that they should sit as jurors in the case.'
If the foregoing conclusions are correct, the prisoner’s challenge to the array of the forty jurors drawn from the Elmira box was not well taken, and was properly overruled, unless the evidence given in support of such challenge shows it should have been sustained, or unless the court erred in some ruling upon offers of evidence. upon the same. The district attorney was not obliged to verify *190 Ms answer to tMs challenge; and if any answer or demal by him of the allegations in the challenge was necessary, the one he made was sufficient. It was immaterial whether either of the forty jurors resided out of the city of Elmira, if they resided in the town of Elmira when the list for that town was made and filed in 1863; and it was also immaterial, in respect to this challenge; whether either of the forty jurors had changed Ms resdence subsequent to July, 1863. The matters offered respecting the Southport list of jurors, and the residences of the forty júrors, and other rejected matters, were immaterial to the question before the court, and were correctly excluded.
The date of the list of jurors for the town of Elmira, in 1863, was immaterial. The list was dated and filed the 4th day of July, in that year. The presumption is that the proper town officers assembled on the first Monday of that month for the purpose of making the list. (2 R. S., 411, § 12.) The statutes as to the date of such lists, and the time they shall be filed, is directory. (2 R. S., 412, §§ 15, 16 and 18; 7 Wend., 417; 1 Abb. N. S., 193.) Such lists are valid, though made and filed at later dates than these mentioned in the statute. (Sedgwick on Stat. and Com. Law, 368 and 372.)
The offer to prove that the town clerk was not present when the list of jurors for Elmira was signed on the 24th day of July, 1863, was immaterial. Proof that he was absent at that time, and was notified to attend a meeting of the other town officers that day, to sign the list, would not have shown he did not meet with the supervisor and assessors on the first Monday of July in that year, and assist in making such list of jurors; and the list was valid without his signature. (2 R. S., 411, § 12; Id., 412, § 15.) And I am of the opimon the prisoner "had no right to impugn the list of jurors returned by the proper town officers, and filed in the office of the county clerk. The list, as returned, was valid, on its face, and it was conclu *191 sive upon the prisoner as to its regularity. (The State v. Brooks, 9 Alabama Rep. N. S., p. 9; Rafe v. The State of Georgia, 20 Georgia Rep., 60; Clarkson’s Case, 3 Alabama Rep., 388; People v. Jewett, 3 Wend., 314; People v. Ransom, 7 Id, 418; 1 Abb. N. S., 193; Cox Cr. Cases, 395; Forsythe v. The State of Ohio, 6 Hammond’s Rep., 20; Carey on Juries, 85; 3 Park. Cr. Rep., 343; 5 Id., 310.)
That portion of this challenge which related to what occurred on the drawing or calling of the thirty-six jurors was untrue, to the knowledge of the court, which the case shows.
If any challenge to the array of jurors would lie for any irregularity in the lists of jurors, as returned by the town officers, it should have been interposed before any juror was drawn from the regular panel, which was partly made up from the Elmira list. I think it was too late to interpose a challenge to the array of the forty jurors for any such irregularity, after such jurors had been drawn and summoned.
It follows that the challenge to the array of forty jurors, drawn from the Elmira box, was properly overruled.
It is proper to say in passing, that before any juror was drawn from the forty Elmira jurors, the prisoner was informed by the court that he had the same number of peremptory challenges remaining he had before the thirty-six jurors were drawn from the Elmira box, or that he would yet have the privilege of making that number of peremptory challenges to jurors as they should be drawn for the jury in the case, to which the district attorney assented.
The foregoing views show that the challenge and objections to the juror, Cooper, who was one of the above men.tioned forty, were properly overruled; also, that the rulings of the court were correct, respecting the offers and objections upon his challenge by the prisoner.
The objection made by the prisoner’s counsel, after *192 twelve jurors had been empanneled, to the prisoner being tried by such jury, on the ground that the same was illegally empanneled, was untenable; but if tenable at first, the difficulty was obviated by the statement of the court (to which the district attorney assented), that the three jurors drawn from the above mentioned thirty-six, might stand aside from the panel, and that three other jurors might be drawn in their places, if the prisoner desired it, and that he could have the same number of peremptory challenges he was entitled to before either of the thirty-six jurors was drawn; and the prisoner should be deemed to have waived any error or irregularity there was in drawing, summoning or empanneling the jury.
The twelve persons who constituted the jury that was obtained in the case, were all residents of Chemung county, and each possessed the requisite qualifications for a juror in the case; and I am of the opinion no error was committed in obtaining the jury which, can be said to have prejudiced the prisoner in the least, or that was not cured by what subsequently occurred on the trial. Great pains were taken by the court to secure an impartial jury in the case, and I think a better or more impartial jury was never empanneled in a capital case than the one in this case. It seems to me a holding that a new trial should be granted in the case, for anything that occurred in empanneling the jury, would be a confession that justice has been ensnared in technicalities, and must be thwarted by immaterial matters that did not affect the merits of the case. I think there is no such cause for reproaching the law, and that our decision upon the foregoing questions should not be such as to invite counsel to defend prisoners upon technicalities instead of the merits of cases. (Ferris v. People, 31 How. Pr. Pep., 140.)
The court did not err in permitting the district attorney to produce in court and show to witnesses, in the presence of the jury, articles of clothing found on the dead body *193 of Mulock, whom it was alleged the prisoner murdered, or in permitting the district attorney to produce in court and show to witnesses, in the presence of the jury, the hat and gun found near Mulock’s dead body, or a watch it was claimed Mulock had on his person the morning he disappeared, or any other article found on or near his dead body, or in permitting the district attorney to produce Mulock’s skull in court. (People v. Larned, 3 Selden, 445; Mulhado v. The Brooklyn City Railroad Co., 30 N. Y. Rep., 370; People v. Kennedy, 32 Id., 141; 5 Cushing, 295; Burrill on Circumstantial Evidence, 2d ed., 135, 137, 259, 264; Starkie on Ev. (by Sharswood), 90 and 91; People v. Salvador, 1866; Same v. Gonzales, MS. Court of Appeals.)
I think it was proper for the district attorney to show the watch to the jury, he claimed was one Mulock had upon his person at the time he disappeared, and which was subsequently disposed of by the prisoner, and identified by witnesses by marks that were on it. It was not erroneous to allow the jury to inspect the watch and judge whether it was probable that witnesses could identify it by such marks as were on it. It was. also proper, in my judgment, to allow Dr. Wey to examine the skull of Mulock in court, with" the broken gun that was found beside Mulock’s dead body, and explain the fractures in the skull and the marks on it to the jury, and to show to them how nicely parts of the gun-lock and sight on the gun fitted the indentations or fractures in the skull. (See authorities, supra.)
I am of the opinion the court did not err in allowing Dr. Wey to state what would cause the wounds or fractures on Mulock’s skull, or how they could be made, or in subsequently permitting the district attorney to ask him this question, viz: “Are you able to state whether the wounds upon this head (Mulock’s skull) might have been produced by blows from this musket ” (meaning the mus *194 ket found near Mulock’s dead body)? His answer was: “ They might have been.” He said his reasons for this opinion were “ that certain prominences upon that musket correspond with certain fractures upon this skull.” He then described how they corresponded. Wey was a physician and surgeon, and made the ‘post mortem examination of Mulock’s body. He was competent to give opinions,where opinions of a medical witness were admissible; aiid I think he was competent to answer the questions put to him as to what would cause the wounds or fractures found on Mulock’s skull, and that his opinions were admissible as evidence against the prisoner. (19 Wend., 572; 5 Selden, 194; 31 N. Y. Rep., 320; 4 Barbour, 615.) I am not entirely satisfied with the decision in Wilson v. The People (4 Parker, 619). But if that case was correctly decided, it does not control this. The questions and answers in this case differ from the questions and answers in Wilson v. The People. And I think we need not overrule that case to sustain the rulings above mentioned in this case. But before I would agree that those rulings in this case were erroneous, I should vote to overrule Wilson v. The People. For I think medical witnesses are competent to testify as to the kind of an instrument or weapon that would produce a particular wound or fracture, and whether a particular wound or fracture might not be made with an instrument or weapon mentioned to the witnesses. And this was the kind of evidence Dr. Wey gave as an expert in this case. ' The question put to him, whether he was able to state the direction from which Mulock’s head received the injury, was not materially different from the others, and was therefore admissible.
The prisoner’s counsel put this question to' the witness, Howell, on his cross-examination, viz: “Have you discovered Mr. Gardiner, while he has been in jail, to be a man of very weak mind ? ” It was objected to, and the objection was sustained. I .think the. objection was correctly *195 sustained. The question was not upon a point inquired about by the district attorney, and it was leading. It called for the opinion of an unprofessional witness, which no one but an expert could give, and the question called for an opinion as to a matter immaterial to the issues tried.-
The prisoner wrote a letter to the district attorney, dated the 17th day of July, 1865, which was while the prisoner was confined in jail on the charge of murdering Mulock, to which letter he made oath before a justice of the peace, on the 18th day of the same month. This letter stated, among other things, the prisoner was near Mulock when he was killed, and that one Robert Main killed him with a gun, and then took his watches and money from his pockets.
The district attorney did not ciaim the right to put this letter in evidence until he proved it was voluntarily written by the prisoner, and sent to him under circumstances that would render it admissible. He then called Ransom and other witnesses to satisfy the court the letter was competent evidence against the prisoner.
The district attorney examined Ransom, who administered the oath to the prisoner attached to the letter. He also examined the sheriff, Howell, as to the circumstances under which the prisoner signed the letter and made oath to it. He then called William Halliday, and was examining him as to his being present when the district attorney read the letter to the prisoner in the sheriff’s parlor, and as to what the prisoner said concerning it, for the purpose of showing the letter was written, signed and sworn to under such circumstances as to make it evidence in the case against the prisoner, when the court informed the witness he might tell precisely what was said between him, the district attorney and the prisoner. The prisoner’s counsel then offered to show that the repetition of the contents of the letter was made under inducements, by proof aliunde, that this statement was thus made by the *196 prisoner; and to prove that that confession was not volun tarily made, but was extorted by inducements, which offer the court rejected, and the prisoner’s counsel excepted. The court then ruled that the district attorney had the - right to proceed in the case., and said to the witness: “ Go on.”
This was a ruling controling the order of giving evidence for the information of the court, which rested in discretion. (1 Greenl. Ev., § 219.) The question was whether the court would permit the district attorney to give evidence to show the letter was a voluntary statement of the prisoner before permitting the prisoner to attempt to prove it was not a voluntary statement; and the court had the right to permit the district attorney to give the first evidence upon the question. The court did not allow the letter to be read to the jury until the prisoner gave evidence on his part which his counsel claimed showed it was not a voluntary statement. I think this ruling, repecting which party should first give evidence, was not the subject of an exception which is reviewable. (People v. Rector, 19 Wend., 578.)
The court clid not permit the district attorney to prove the contents of the letter by the confessions of the prisoner; and when Halliday was asked to state what the prisoner said “in relation to the facts in the case,” the prisoner’s counsel did not object to the question; and none of the evidence Halliday subsequently gave on his direct examination was objected to by the prisoner’s counsel. The questions put to'him on his direct examination, which were objected to by the prisoner’s counsel, were not answered.
If the court erred when the prisoner’s counsel was refused the privilege of asking Howell if he had discovered the prisoner, while he had been in jail, to be a man of' very weak mind, the error was cured before that branch of the case was finished, by the court ruling that the pris *197 oner’s counsel might show the prisoner was an impressible man, and would do anything that was told him; and witnesses were allowed to testify to any facts, or circumstances, or peculiarities, tending to show his mind was weak or unsound, though an unprofessional witness was not permitted to give his opinion from his observation of the prisoner whether he was of sound mind, which ruling was correct.
The court, after hearing the evidence on both sides as to when and how the letter was written and verified, ruled that the letter was competent evidence for the people against the prisoner, to which ruling the prisoner’s counsel excepted. The letter and affidavit or jurat, signed by the justice who administered the oath to the prisoner, were read in evidence by the district attorney; and the prisoner’s counsel seems to regard the question, as to the admissibility of this letter, the most important one in the case. It is the only question he spent much time in arguing. He did little more than state his other points in the case.
The evidence given by persons confined in jail, charged with crime, in regard to the manner the letter was written and delivered to the district attorney, and touching the purpose for which it was put forth, was not entitled to much weight. The whole of the evidence on the question, considered together, justified the conclusion that the letter .was written, sworn to and delivered to the district attorney, with the intention of clearing the prisoner, by charging the murder he had perpetrated upon Main, who was his tent-mate at the time the murder was committed. I think the letter should be deemed the production or composition of the prisoner, whether he concocted it, or only adopted it after it was composed and writted by a fellow prisoner. It was a device of the prisoner, whether original or' second-handed, to fasten his own crime upon his innocent tent-mate. And the general rule is, that whatever falsehood a person charged with crime concocts, to avert' *198 suspicion from himself, is admissible evidence against him. (3 Greenl. Ev., § 137.) And on the same principle, whatever falsehood a person thus situated puts forth, to charge his own offense upon another who is innocent, must be competent evidence against himself.
If the prisoner’s letter should be regarded as a confession, I think it was competent evidence against him. No promise was made or inducement was held out to him to write the letter or to speak of/its contents, by any person who had anything to do with his apprehension, imprisonment or prosecution; and he voluntarily signed the letter, if he did not write the whole of it, and voluntarily sent it to the district attorney; and he was sworn to it at his own request, for the purpose of having Main arrested, and he •should be regarded as acting as complainant against Main, with the view of fastening his own crime upon him, and all he did for that purpose was voluntarily done. (Rex v. Row, 1 British Crown Cases, 152; Joy on Confessions, Law Library, 4th series, vol. 15, pp. 22 and 23; 1 Greenl. Ev., § 223; 3 Id., § 137; 1 Parker, 406; Hendrickson v. The People, 6 Selden, 9.)
In The People v. McMahon (15 N. Y. Rep., 384), the prisoner did not testify at his own request, but he was taken before the coroner by a constable, and sworn and examined as a witness (and as I understand the case), at the request of the coroner, or on the suggestion of some per-. son who was aiding in making the investigation, as to how and in what manner the wife of the prisoner came to her death; and the Court of Appeals held his evidence, given on his examination before the coroner, was not admissible against him on his trial for the murder of his wife. That case differs widely from this, in which the prisoner, upon his own reasoning, or with the advice of some of his fellow prisoners, voluntarily prepared a letter, and voluntarily verified it on oath, with the hope of saving his own life by charging his crime upon another.
*199 In The People v. McMahon, the prisoner was obliged to testify before the coroner, or refuse on the ground he could not testify without criminating himself, which would have been very prejudicial to him. But the prisoner in this case was not requested, by any person who had, or ever had had, any control over him, or connection with the case, to write the letter in question, or to send it out of jail; and he was not obliged to swear to. it to avoid any suspicion prejudicial to himself. His entire connection with the letter was purely voluntary; for whatever part his fellow prisoners took in the conspiracy, if there was one, to fasten the murder of Mulock upon Main, he was a principal in it. The false oath he took, when he verified the letter, was taken without the shadow of an excuse. It seems to me any court would stultify itself to hold that a statement made by a prisoner, as this letter was written, sworn to and made public, was not voluntary, or that it is not competent evidence against the author on his trial for the crime wickedly charged in it upon an innocent person, whether the statement be called a confession or not. I think the time has not come when a person, indicted for murder, can voluntarily make and publish a statement for the purpose of falsely charging such crime upon another, which fails to effect- the object intended, but through inadvertence, or for want of foresight, shows the author to be the real murderer, and have such statement excluded as evidence on his trial.
I am of the opinion the prisoner’s letter in this case, if it can properly be called a confession, was admissible as evidence against him, not for the reason that it was supposed to be entirely true, but because most of it was false, and yet showed, or strongly tended to show, the prisoner was guilty, when he intended it should have the contrary effect.
The court charged the jury that the confessions of the prisoner were not evidence against him unless they were *200 voluntary; and I am of the opinion the part of the charge respecting the letter was correct.
The prisoner’s counsel offered to prove that other prisoners broke out of the jail in which he was confined after he was indicted, and that certain fellow prisoners tried to induce him to go out, and he would not do so. This offer was properly excluded upon the authority of The People v. Rathbun (21 Wend., 509).
Mulock was as' well known by the name of Amasa Mulock as he was by the name of Amsey Mulock, as he spelled his name and wrote it. There was, therefore, no misnomer of him in the indictment, though his name is only given therein as Amasa Mulock, The rule is, if a party or person be known by one name as well as another, he may be described by either. (Barb. Cr. Tr., 287; State v. Gardiner, Wright's Ohio Rep., 392.)
Whether the name of the murdered person was correctly stated in the indictment, was a question for the court to determine upon the evidence; and it was correctly decided by the court.
I am satisfied the charge to the jury was as favorable to to the prisoner as it should have been. I think none of the exceptions to it, or to the alleged refusals to charge the jury are well taken;, and I do not think it necessary or expedient to discuss any of such exceptions.
There are exceptions in the case that were taken by the. prisoner’s counsel, which I have not deemed of sufficient importance to notice in this opinion; but I have examined all of them, and I think neither of them was well taken.
The evidence leaves no reasonable doubt that the prisoner is guilty of the crime of which he has been convicted; and I am unable to see how he could be benefited by a new trial, unless the people should be unable to procure the attendance of their witnesses on-such trial, or this court or the Court of Appeals should hold that one of his special pleas was improperly overruled; yet I should vote for granting *201 him a new trial if I were of the opinion any error, affecting the merits of the case to his prejudice, had been committed on the trial he has already had.
My conclusion is that no error affecting the merits of the case, prejudicial to the prisoner, was committed on his trial, and that the judgment against him should be affirmed and executed, according to the statute applicable to the case.
Parker, Mason and Boardman JJ., concurred.
Judgment affirmed.
Note.—The prisoner was brought before the Broome General Term in January, 1867, by habeas corpus, and sentenced to be hung at Elmira on the first day of March, 1867 (3 R. S., 5th ed., 937, §§ 23, 24), and he was executed on that day at Elmira. He made a full confession of the crime charged upon him, before he was executed, but attributed it to the influence of bad women and intoxicating liquor.