## MILAM M. HUBBY *v.* THE STATE.

1. MURDER — EVIDENCE. — On a trial for murder, it is competent for the State to prove acts of the accused, antecedent to the act of killing, which, either in themselves or in connection with other circumstances, tend to prove motive or preparation.

2. SAME. — On the trial of a prisoner charged with homicide, it is competent to prove all circumstances connected with the state of the body of the deceased when found, the tracing by stains, marks, or impressions, the finding of instruments of violence on the spot or elsewhere, — in short, all visible *vestigia* as part of the transaction.

3. SAME. — After a witness has described articles found near the deceased or elsewhere, and which appear to have been connected with the deceased, or used in the commission of the crime or secretion of the body, it is competent to exhibit the articles for identification.

4. PRACTICE. — It is competent to allow a witness to refresh his memory as to matters concerning which he is being interrogated, by reading his testimony given on a committing trial; the witness being cautioned by the court, before he testifies, that he shall testify solely from his memory, after having it so refreshed, and not otherwise.

5. CHARGE OF THE COURT — PRACTICE. — An inaccuracy in a charge upon implied malice will not constitute material error, when the facts of the case are such as that a charge upon murder in the second degree is not called for by the evidence.

6. Implied Malice. — The law implies malice upon proof of a voluntary homicide, and the absence of any facts in evidence which may tend on the one hand to establish the existence of express malice in the mind of the slayer, or on the other hand to show justification, excuse, or mitigation.

Appeal from the District Court of Milam.    Tried below before the Hon. S. Ford.

The appellant was indicted by the grand jury of Milam County for the murder of W. H. Gardner on the twenty-seventh day of May, A. D. 1879. On the nineteenth day of November, A. D. 1879, he was tried and found guilty of murder in the first degree, and his punishment affixed at death.

The facts proved upon the trial were substantially as follows : —

On the twenty-eighth day of May, 1879, the body of a dead man was found in a chaparral thicket on Little Pond Creek in Milam County, Texas. On the body of the deceased there were three gunshot wounds in the region of the heart, and others in the stomach. The wounds had the appearance of having been inflicted with buckshot. It was proved by expert testimony that either of the three wounds in the region of the heart was sufficient to produce death, and that the death was caused by the wounds.

The body was identified as that of W. H. Gardner. When found it was in a dense chaparral thicket, and was almost entirely denuded of clothing, and full of thorns and scratches. The neck was cut deep all around, as if done by a rope in dragging it. The body was found by following a trail made by the dragging of it for about six miles. The trail started from a point near the Cameron road, about a half-mile distant from the residence of the defendant, Milam Hubby, in the direction of the town of Cameron. Near the initial or starting point of the trail, about twenty feet distant, a pool of blood was found, and also tracks

where a man had stood near the roadside, behind a clump of trees; and in a mesquite thicket near by, a horse's tracks were found in a hollow. There was found, about three or four hundred yards from the body, a bundle of clothing secreted in a thicket.

The deceased and one Rose lived together on the place of the accused, and were his tenants. Ill-feeling was shown to have existed between the accused and Rose, and in which the deceased was supposed to have participated.

On the 26th of May, A. D. 1879, the accused made complaint against Rose, charging him with having shot at the wife of the accused. The writ for his arrest was issued and executed the next day, and the accused accompanied the sheriff from the town of Cameron to arrest Rose, but left the sheriff shortly before getting to Rose's house, which was some eight miles from Cameron, and repaired to his own home. Rose was arrested, conveyed to Cameron, and lodged in jail; the deceased, Gardner, by permission, accompanied the sheriff and Rose to Cameron, so as to bring back the horse ridden by Rose. On the same evening the accused, while at home, and preparing to go on a cow-hunt, provided himself with a shot-gun. He requested his wife to sew some buttons on his coat, so as to hide his shirt, saying that he " did not like to ride around at night with his shirt exposed, — that it would be a good target to shoot at," and that his renters, Rose and Gardner, had troubled him a good deal; that he had not had any fuss with Gardner, except that Gardner had followed him a day or two before, when he (Hubby) turned upon Gardner with a gun, and asked him what he was following him for, and Gardner replied that he was not following him. Hubby said he was " afraid of Rose and Gardner from the bush." On the same evening, " about half-way between sundown and dark," Hubby rode up to the house of one of his neighbors, about a mile distant, on a bay horse; he had a shot-gun with him, and told the witness that Rose and Gardner had been killing

his (witness's) hogs, and that Gardner had gone to Cameron that day to bring back Rose's horse. As he left the witness's house, he said he must go, as he might be waylaid; that his renters had been aggravating him. Hubby left in the direction of his own home, which was also in the direction in which Gardner was killed. Gardner was killed about one mile and a half distant from witness's house, and about half a mile distant from and beyond the house of Hubby.

Another witness, who lived on John Cullen's place, about three quarters of a mile from Hubby's house, in the direction of Cameron, testified that on the night of the 27th of May, about dark, he saw Hubby riding along the road on a bay horse, at a point about four hundred and fifty yards distant from where he next day found blood in the road, tracks, etc. Hubby had a gun with him, which witness took to be a shot-gun. On the same evening he saw Gardner, the deceased. Gardner took supper with him that night, and remained at his house until near nine o'clock, when he left, going in the direction of home. The next time he saw Gardner it was when he found his dead body in a thicket on Pond Creek, the next day. He found the body by following the trail, as described in the first part of this statement of facts. Shortly after Gardner left, witness heard "an unusual noise, but was nearly asleep; it sounded like a cat fell off the house." As witness went out next morning, he saw Gardner's horse feeding around on the prairie, with the saddle on; he caught the horse, and found blood on the saddle and on the horse's neck.

Another witness, who also lived on Cullen's place, testified that on the night of May 27, 1879, between eight and nine o'clock, he heard a gun fire a little east of where he lived. It seemed close. The next morning he walked down the road in the direction in which he had heard the shot the night before, and found where something had been dragged across the road. Found blood in the road about three or four hundred yards from where he lived. The

trail commenced about twenty steps from the road, and crossed it. He and others followed the trail for about six miles, and found the body of Gardner. The country through which it had been dragged was mesquite prairie, chaparral and prickly-pear thickets. He then described the condition of the body when found.

About eight o'clock the next day after the killing, Hubby appeared at a neighbor's house, about two miles distant from where he lived. He was riding a bay horse, and expressed to the lady of the house fears that his renters would follow and kill him. He remained at the house some hours, and when the dinner-horn was blown he left, saying that he would come back after the hands went away; that he was afraid the negroes would tell those men (Rose and Gardner) that he was there. He expressed fears that his family was murdered, and at his request a boy was sent to his house to inform Mrs. Hubby of his whereabouts. When the boy returned he told of Gardner's horse being found, with blood on the saddle. Hubby appeared much frightened, and left in five or ten minutes thereafter. He asked for provisions for breakfast and supper, and for a cold-chisel to take the shoes off of his horse. He requested that a horse be sent him at an appointed place the next morning, and that the provisions and chisel be sent him by the boy. He said he should have put on a clean shirt before he left home; that the one he was wearing was the one he had on when he killed the beef. When the boy returned from Hubby's house, he brought some beef back, which Hubby said he had killed the day before. It was half dry, and had the appearance of having lain in the sun for several days.

Another witness who was present on this occasion testified that there was blood on the shirt; that when the boy was started to see about Hubby's family, Hubby cautioned him not to tell any one that he was there. Hubby's horse had been wet with sweat, and it had dried on him, and there were prickly-pear thorns sticking in his breast. Hubby

asked witness if he would "stick to him." Witness was at Hubby's house the Thursday after the killing (May 29th); saw a shot-gun in the rack, the right-hand barrel of which was cocked, and the cap on the tube looked as if it had been recently exploded, and the barrel was black with powder at the muzzle; the other barrel had a fresh cap on, and looked as if it had not been fired in some time.

On the 29th of May, 1879, the defendant was seen in Falls County, Texas, wearing a coat upon which there appeared to be blood, and the pocket of which was torn away. On the evening of that day he stated to another witness that he had had trouble with one of his tenants, and that a man was murdered and he accused of it. Another witness testified to a conversation between himself and accused on the evening of May 29th, in which he told the accused that the people believed he (the accused) had waylaid and killed Gardner; to which the accused replied, "He has been waylaying me." In a conversation between the same parties, the next day, the witness said, "Milam, Brazeale says there was blood on your coat." The accused replied, "Look and see." Witness then said it was another coat, with the pocket torn off; and accused replied, "That coat is in my saddle-bags; I will get it and show it to you." Witness remarked that he did not want to see it; and accused then said, "Why, you would not tell on me, would you?" Witness afterwards said to the accused, "Milam, that was the greenest thing I ever knew a man to do, — to kill a man and drag him off; didn't you know that they would follow the trail and find him?" The accused replied, "That was a green thing." Another witness testified to a conversation with the accused, in which the accused stated, "This is a bad thing I have got into." Witness replied, "Yes;" and the accused then said either "if he had done it," or "did do it," he was justifiable, because Gardner had shot at his wife and threatened his life.

There is much more evidence in the record, of the same

general character as the above, showing that the accused was hiding around the country, trying to avoid arrest, talking and showing a great deal of uneasiness. It was proved that when he was arrested he was riding along the road, and was provided with provisions enough to last him a week. While being searched he fell, and claimed to have fainted.

It was also proved that on the execution of a search-warrant sued out during his examining trial, early in June, a rope was found in the house of the accused, hanging up behind the door. The rope was a new grass-rope, about forty-five feet long. One end of the rope had a knot in it; the knot was flat on one side, as if something had been dragged on it; had mud on it, and was worn; the end beyond the knot was frizzled. About five feet from the other end was a kink in the rope; on the end was a loop and noose. The rope between the kink and loop and noose was sweaty, and in the loop and noose was blood. The rope between the two ends was clean and new-looking, and did not show signs of use except on the ends, but on the rope were spots of blood.

On the part of the defence it was proved that when the sheriff was getting ready to send a deputy to Hubby's house with a search-warrant to search for the rope, Pope, *alias* Tiller, came to him and told him where the rope was; that Pope was then living at Mrs. Hubby's; that in a week or ten days after the killing of Gardner, Pope went to Mrs. Hubby's to live. It was proved by several witnesses that Pope, *alias* Tiller, and Mrs. Hubby lived together after the killing. One witness testified that shortly afterwards Pope and Mrs. Hubby left the country together, saying they were going to Georgia, — and leaving a legacy to the neighborhood, in the shape and persons of two of Hubby's children.

It was also proven that on the evening of May 26th Hubby was wearing a hickory shirt, which had blood on it;

that he then said he had been killing a beef, and got blood
on his shirt.    It was also proved that on the morning of May
26th Hubby took some fresh beef to a merchant he traded
with.    It was testified by a merchant that on the 5th of
May he sold Hubby a rope of the same general description
as the rope produced in court, and which weighed within
the weight of an eight-penny nail of that rope.    It was
further proved that on the morning of May 28th there were
twenty or twenty-two calves in Hubby's pen, freshly
marked and branded.

The State proved an *alibi* for Pope.

*Chandler & McGreagor* and *W. H. Hammon,* for the
appellant.

*Thomas Ball,* Assistant Attorney-General, for the State.

CLARK, J.    When the facts of the case and the manifest
theory of the prosecution are considered, the alleged objec-
tionable evidence as set out in appellant's first, fifth, and
sixth bills of exception seems equally pertinent to the issue
then before the jury for determination, and clearly admis-
sible under the rules of evidence as frequently expounded by
the courts.

The deceased and the man Rose were brothers-in-law to
each other, lived together on the farm of the defendant,
and constituted his only tenants.    The appellant's ill-feeling
seems to have been directed at both jointly, and his appre-
hensions of personal danger, if any such existed, were in-
dulged in by him with reference to both.    It was important
to the prosecution that the date of the homicide, as well as
the date of certain declarations made and acts done by
the appellant immediately anterior to the homicide, should
be fixed as definitely as might be practicable, and that the
two men against whom he entertained a feeling of bitter
hostility were separated, and one of them was safely lodged
in jail, through the direct instrumentality of appellant,

only a few hours before the assassination of the other, and when the latter was evidently upon his return home from accompanying the former to the jail. If appellant was in fact the assassin, — and this was the only subject of inquiry, — but few facts could in their nature be more significant than that he, by means of a trumped-up accusation against one of his adversaries, had succeeded in removing him from the theatre of his proposed operations, and at the same time had procured a most favorable opportunity for wreaking his vengeance upon the other, when he was deprived of the help of his friend and was returning to his home in the darkness of night and unsuspicious of danger.

The procurement of the warrant of arrest for Rose, the circumstances leading to its issuance and accompanying its execution, were all so interwoven with the whole transaction leading to the death of Gardner, the deceased, as to be really part and parcel of that culmination, and illustrative not only of the general purpose and intent of the appellant, but also strongly criminative of him as the guilty perpetrator of the homicide. By it was shown *motive, preparation,* and *opportunity,* and no reason is perceived why the State should have been deprived of it. *Preston* v. *The State, ante,* p. 30.

Nor is any error perceived in the action of the court in admitting evidence touching the clothing found near the body of the deceased, and the rope found in the house of appellant after the murder. From the explanation of the presiding judge, appended to the bills of exception, it appears that these articles were not in fact introduced in evidence, but were produced by the prosecution and shown to the witnesses for purposes of identification, and after both had been described. This evidence was admissible. Burrill on Cir. Ev. 254–260. It does not appear by positive testimony that the clothing found was the clothing of the deceased; but that is a natural if not a necessary inference, when viewed in connection with the fact that the body,

when found, was almost entirely denuded. The form in which the clothing was when found — carefully bundled up, and concealed some distance from the body — is not without some significant bearing; but if immaterial, no possible prejudice could have resulted to appellant. A rope or some similar instrument evidently constituted an important factor in an attempt at concealment of the dead body. The evidence establishes most convincingly that after the assassination had been accomplished, the person of the deceased was stripped of its clothing, a rope or similar appliance was fixed about the neck, and the body thus dragged for six miles across prairies studded with mesquite bushes, chapparral, and prickly-pear thickets, and finally concealed in a thicket on Little Pond Creek. When found, the neck of the body, as stated by a witness, "was cut in deep all around, as if done by a rope around it."

Certainly the finding of a rope in the house of appellant, after his arrest, which, from the marks and indications upon it, had evidently been used for some similar purpose, was a fact competent to go to the jury; and the fact that the witness produced the rope and described it to the jury does not render the proceeding erroneous, especially as no ground of objection was shown or urged before the court. The exhibition of the articles in the condition in which they were found was more satisfactory, in connection with the other circumstances, than any description that could have been given by the witnesses, even had the articles been actually offered in evidence. As said by Starkie, "upon the trial of a prisoner on a charge of homicide or burglary, all circumstances connected with the state of the body found or house pillaged, the tracing by stains, marks, or impressions, the finding of instruments of violence, or property, either on the spot or elsewhere, — in short, all visible *vestigia*, as part of the transaction, are admitted in evidence for the purpose of connecting the prisoner with the act. Such facts and circumstances have not improperly been termed inanimate

witnesses." 1 Stark. on Ev. 66; *The People* v. *Gonzalez*, 35 N. Y. 49; *Gardner* v. *The People*, 6 Park. Cr. 155; *Wynne* v. *The State*, 56 Ga. 113; *Campbell* v. *The State*, 12 Ala. 40; *The Commonwealth* v. *Pope*, 103 Mass. 440; *The State* v. *Outerbridge*, 82 N. Y. 617; 1 Whart. on Ev., sect. 346; Whart. on Hom., sect. 674.

The remaining objection to the competency of testimony relating to the production of the testimony before the examining court may be disposed of with the single remark that the record was handed to the witness Weiss, upon his own request, simply for the purpose of refreshing his memory as to certain declarations made by defendant to the witness, and for no other purpose, and the witness was properly cautioned by the court that he must testify from his memory, as refreshed, and not otherwise. It is hardly necessary to say that this procedure was legitimate. Whart. on Ev., sects. 516, 526.

The charge of the court is complained of in numerous particulars, but upon inspection is found to be a fair and distinct presentation of the law applicable to the case; containing, however, an inaccuracy wholly immaterial in view of the evidence. Upon the subject of implied malice the court instructed the jury as follows: " When one unlawfully kills another, and such killing is not shown to have been done with express malice, as before defined, but it is shown that the killing was done without any, or a considerable provocation, here the law presumes malice, and malice so presumed is denominated implied malice." While this is not an exact definition of the term " implied malice," yet we cannot say that it did not sufficiently convey to the jury the legal signification of the term in a manner at least as favorable to the defendant as he could demand, had the facts in the case called for any charge upon the subject. The law implies malice upon proof of a voluntary homicide, and the absence of any facts in evidence which may tend on the one hand to establish the existence of express malice in the mind

of the slayer, or on the other hand to show justification, excuse, or mitigation. *Harris* v. *The State, ante,* p. 90; *Douglas* v. *The State, ante,* p. 520. The case as made, however, did not call for any instruction as to the law of murder in the second degree, though generally in all prosecutions for murder it is the safer·practice to instruct as to both degrees. The evidence elicited developed a deliberate assassination, and nothing else, and the sole question at issue was as to the identity of the perpetrator. No legitimate inference arises from the testimony save that the deceased was waylaid and killed, and his body subsequently concealed. All the *indicia* of the transaction manifests a killing with a sedate, deliberate mind, and formed design; which design was clearly and convincingly evidenced by all the external circumstances attendant upon and subsequent to the main transaction, and which fully discover and illustrate that inward intent. The particular instruction, therefore, even if erroneous, was not demanded by the facts and circumstances in evidence, and cannot constitute a reversible error upon appeal.

The charge upon the law of circumstantial evidence, though perhaps unnecessarily diffuse, contains fully the essential principles of the law governing convictions upon that character of evidence, as found scattered throughout our reports. It has been frequently held that no exact formula need be employed in giving such an instruction to the jury (*Loggins* v. *The State, ante,* p. 434), but, as a matter of practice, courts can very well follow the rule in Webster's case, as concisely stated by the reporter, and which is not susceptible of improvement. See *Henderson* v. *The State,* 14 Texas, 514.

The first instruction requested by appellant is found substantially embodied in the main charge, and the second could not be the law in any case, and was properly refused.

The sufficiency of the evidence to support the·verdict is

the remaining subject of inquiry, and, in view of the gravity of the issue, to this we have addressed ourselves with unusual care. Apart from the declarations by appellant to other persons, after the homicide, and which may be regarded as tantamount to an admission of guilt, the salient, inculpatory facts established point with unerring if not conclusive certainty to the accused, and to no other person, as the guilty perpetrator of what can only be regarded as an assassination. The attempt to establish by evidence a theory that another did the act, resulted in total failure in assigning to that other any motive for such a deed, or even an opportunity for its commission, and left the whole evidence pointing, with its strong array of indubitable facts, at the appellant. When examined critically, there is nothing left to be supplied in the evidence. The motive, the opportunity, the conduct and appearance of appellant after the fatal transaction, the instruments by which the deed was consummated, and which were found in his house, are so plainly shown, and surrounded with such significance, that a jury could not well mistake the locality of the guilt; and the conduct of appellant subsequent to the homicide, and up to the time of his arrest, serve to illustrate with peculiar emphasis that mysterious law which often impels the murderer to furnish most satisfactory proofs of his guilt in a vain attempt to manifest his innocence.

In passing upon the sufficiency of evidence in this tribunal, it is only necessary that we determine that the verdict is supported by, and is not contrary to, the evidence; but in this particular case we are constained to say that, from the evidence, the guilt of appellant was established beyond a reasonable doubt, and the jury could not have found otherwise than for murder in the first degree. After a fair trial, the appellant has been convicted according to the forms of law, and the duty of this court is ended when it is so declared. Under a law which gave the jury of his own selection the privilege of affixing a milder penalty, they have

determined upon their oaths that the penalty of death only
was adequate to the offence committed, and in the exercise
of a prerogative vested solely in them, they have affixed
that punishment. Finding no error in the proceedings,
and that the verdict is not contrary to the evidence, nothing
remains for us to do, in accordance with the duty imposed
upon us by law, but to affirm the judgment, and it is so or-
dered.

Affirmed.